**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **CHRISTIAN GABLE,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **Civil Action No.** 4:26-cv-2780 |
| | § | |
| **CITY OF MAGNOLIA, TEXAS and** | § | |
| **MATTHEW "DOC" DANTZER,** | § | |
| | § | |
| **Defendants** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Christian Gable ("Plaintiff" or "Ms. Gable") files this Original Complaint against Defendants City of Magnolia, Texas (the "City"), and Matthew "Doc" Dantzer ("Mr. Dantzer" and, collectively with the City, "Defendants"), and respectfully shows as follows:

### I. PARTIES

1. Ms. Gable is an individual resident of the State of Texas.

2. The City is a municipal corporation organized under Texas law, and it may be served through its City Secretary or other authorized agent at 18111 Buddy Riley Blvd., Magnolia, Texas 77354, or wherever they may be found.

3. Mr. Dantzer is and was at all relevant times the Mayor of the City and therefore the final policymaker for the City's internal operations, including without limitation the City's personnel decisions. He is sued in his individual and official capacities and may be served at 18111 Buddy Riley Blvd., Magnolia, Texas 77354, or wherever he may be found.

### II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because Plaintiff's claims

against Defendants are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy.

5.     Venue is proper under 28 U.S.C. § 1391(b) because Defendants are located and/or reside, and a substantial part of the events and omissions giving rise to Plaintiff's claims against Defendants occurred, in Montgomery County, Texas, within the Southern District of Texas. This Court therefore has personal jurisdiction over the City, a Texas municipal corporation located within the Southern District of Texas, as well as Mr. Dantzer.

### III.  CONDITIONS PRECEDENT

6.     All conditions precedent have been performed or have occurred.

### IV.  FACTS

**A.  Ms. Gable's Employment with the City**

7.     Ms. Gable began working for the City in August 2021. At the time, she had recently lost her job due to the COVID-19 pandemic and was moving back in with her parents. Mr. Dantzer was her parents' neighbor and a family friend of approximately 10 years, and she would occasionally interact with him as a result. And, when Mr. Dantzer (who was then a City Council member) found out that Ms. Gable lost her job, he offered her a position with the City as a Floater in the Utilities Department.

8.     As a long-time neighbor and family friend, Mr. Dantzer occasionally made inappropriate sexual jokes and comments to Ms. Gable in the past. But when Ms. Gable became a City employee, Mr. Dantzer's unprofessional behavior quickly escalated.

9.     At the start of her employment, for example, Ms. Gable would often return to her family's home for lunch. But when Mr. Dantzer caught on to Ms. Gable's lunch routine, he began showing up, uninvited, and waiting in the home for her to arrive. He would then typically engage in small talk but, with each subsequent visit, increasingly corner Ms. Gable in certain parts of the

house as well. Eventually, this made Ms. Gable so uncomfortable that she stopped going home for lunch entirely.

10.     Not long after she was hired, Ms. Gable was promoted to the role of Permits Technician and eventually assumed the role of Planning Coordinator. In early 2023, Ms. Gable took on additional responsibilities as the Interim City Secretary after the former City Secretary resigned. By late 2023, Ms. Gable was promoted to the role of City Secretary on a full-time basis.

11.     In her role as City Secretary, Ms. Gable worked from the offices in City Hall. Ms. Gable's office was not only in the same building as Mr. Dantzer's office, but it was also accessible through a file room and adjoining hallway that led to an office neighboring Mr. Dantzer's. Thankfully for Ms. Gable, Mr. Dantzer rarely came to work at the office during the regular course of business (which presented less opportunities for harassment).

12.     When Mr. Dantzer did work from the office, however, the unprofessional jokes and sexual comments persisted. For example, Mr. Dantzer would often introduce Ms. Gable to his guests at City Hall as "the City Sexetary" or, occasionally, "my Sexetary." But because Mr. Dantzer was "the chief executive officer" of the City, *see* Tex. Loc. Gov't Code § 22.042(a), and therefore her superior, Ms. Gable felt she had no other choice but to endure Mr. Dantzer's harassment if she wanted to keep her job.

**B.  Mr. Dantzer Sexually Assaults Ms. Gable in Fort Worth**

13.     From October 29 to October 31, 2025, Ms. Gable attended the Texas Municipal League's Annual Conference in Fort Worth, Texas, along with Mr. Dantzer and two other members of City management: the City Administrator, Chris Whittaker ("Mr. Whittaker"), and the Human Resources Director, Kristy Powell ("Ms. Powell").

14.     Ms. Gable was five months pregnant at the time.

3

15.     After dinner on the night of October 29, Mr. Dantzer offered to walk Ms. Gable back to the hotel while the others continued their night out. After checking her GPS and confirming it would only be a 12-minute walk back to the hotel, Ms. Gable reluctantly accepted. But because of her past experience with Mr. Dantzer, Ms. Gable texted her boyfriend (now fiancée) that she was about to walk back alone with Mr. Dantzer as a precaution (since her boyfriend was aware of the prior incidents with Mr. Dantzer).

16.     On the walk back, Mr. Dantzer began to make inappropriate and sexualized statements to Ms. Gable. Approximately halfway between the restaurant and the hotel, Mr. Dantzer asked Ms. Gable whether she was wearing pajama pants. Ms. Gable responded that they were not, but they appear loose because she needed them to accommodate her pregnancy. Mr. Dantzer responded: "You know what that means to me, right? They're easy to pull down." But when Ms. Gable responded that they were actually tight due to her pregnancy, he stated that they'd be easy to pull down after they "get past the bump" then repeatedly attempted to pull her pants down as they continued walking down the street.

17.     Initially, Ms. Gable yelled out. Fearful of Mr. Dantzer's position of authority over her, however, Ms. Gable quickly composed herself and attempted to play it off as a joke. But as they approached the hotel entrance, Mr. Dantzer then asked Ms. Gable whether her boyfriend "knows how to handle" her because she is "crazy." After Ms. Gable jokingly replied, "he's aware," **Mr. Dantzer suddenly—and violently—grabbed Ms. Gable's throat and pinned her against a column while saying "you need to tell him to do it like this."**

18.     Ms. Gable, now in fight-or-flight mode, yelled out and managed to push Mr. Dantzer off, after which she attempted to regain her composure and retreated to her hotel room. Mr. Dantzer sent her a text message apologizing shortly thereafter.

19.     Ms. Gable reported the sexual assault to Ms. Powell the next morning after it occurred, and Ms. Powell immediately notified Mr. Whittaker of the same. In response, Mr. Whittaker encouraged Ms. Powell to formally report the sexual assault in writing—and for Ms. Gable to report it to law enforcement (which she did)—and otherwise indicated his support.

20.     On November 4, Ms. Powell submitted a written report to Mr. Whittaker regarding the sexual assault, along with a request for whistleblower protection under the Texas Whistleblower Act (the "Act"). Later that day, Mr. Dantzer suddenly appeared in Ms. Gable's office, slammed his palms on her desk without exchanging so much as a greeting, and caused his entire body to hover inches from Ms. Gable's face. A few silent moments later, Mr. Dantzer stepped away then began to question Ms. Gable on whether and where she had recently purchased a home. Still fearful of her safety—but also of losing her job—Ms. Gable remained vague and responded with an approximate location. Mr. Dantzer quickly retorted by naming the exact neighborhood, <u>implying that he somehow already knew where she was moving</u>.

21.     On November 5, Ms. Gable submitted her own written complaint and request for whistleblower protection stemming from the October 29 sexual assault. Shortly thereafter, Ms. Gable was informed that the City would hire third-party investigators to conduct an investigation. The City Attorney, Leonard Schneider ("Mr. Schneider"), also called and instructed Ms. Gable to keep this matter confidential, act as if nothing happened, and continue reporting to work at City Hall until further notice.

22.     After Ms. Powell submitted her written report on November 4, several employees with a close personal and working relationship with Mr. Dantzer began to make her work environment even more hostile in apparent retaliation for reporting the sexual assault. Two different City employees then confirmed Ms. Powell's fears when they informed her that Mr.

Dantzer explicitly stated he was "going after" Ms. Powell, Ms. Gable, and Mr. Whittaker—and wanted to terminate their employment—for reporting the sexual assault. By late November 2025, Mr. Dantzer and the employees close to him made Ms. Powell's work environment so intolerable that she felt compelled to resign.

**C. The City Fails to Adequately Investigate and Protect Ms. Gable Following the Sexual Assault**

23. In the months after Ms. Gable submitted her written complaint against Mr. Dantzer, she continued to work from the office as required. The City did not place Mr. Dantzer on administrative leave, move his (or Ms. Gable's) office to a different location, or take any other safety precautions pending the investigation results.

24. Unsurprisingly, Ms. Gable's workdays were filled with dread and anxiety at the prospect of Mr. Dantzer appearing any minute and repeating the October 29 assault—or worse. This fear was made more acute by the fact that Mr. Dantzer's office was located in close proximity to Ms. Gable's office.

25. In mid-January 2026, Mr. Dantzer uncharacteristically began to appear at the office every workday and remain there throughout the day. This sudden change in Mr. Dantzer's behavior obviously caused Ms. Gable further anxiety—including to the point that she began closing the door to the hallway leading to the neighboring file room and hanging a baby rattle from the doorknob (to alert her if Mr. Dantzer attempted to enter her office from there).

26. At this point, Ms. Gable had begun losing sleep and was becoming crippled with anxiety due to her attacker's continued presence at her workplace.

27. Furthermore, Mr. Whittaker essentially acted as Ms. Gable's intermediary with Mr. Dantzer for City business during this period. On January 28, however, the City suddenly

terminated Mr. Whittaker's employment, thereby removing yet another barrier between Ms. Gable and her attacker.

28.    Unbeknownst to Ms. Gable, at that point the City had already concluded its investigation into the sexual assault _weeks ago_—which, coincidentally, was around the time Mr. Dantzer began regularly appearing at the office—and yet allowed her to continue working in close proximity to her attacker, day after day, while at this point _eight months pregnant_.

29.    Specifically, the City Attorney, Leonard Schneider ("Mr. Schneider"), called Ms. Gable few hours before close-of-business on January 28, 2026, and finally informed her—for the first time—that the investigation into her complaint had concluded. Shockingly, he also informed Ms. Gable that the City formally closed the investigation _over two weeks_ earlier on the evening of January 13, immediately after that evening's City Council meeting.

30.    On January 29, Mr. Schneider assured Ms. Gable that she would be provided with a copy of the investigation report. She was then invited to a virtual meeting with the lead third-party investigator hired to investigate the sexual assault: Bill Helfand ("Mr. Helfand") of the law firm Lewis Brisbois Bisgaard & Smith LLP.

31.    At the January 29 virtual meeting, Mr. Helfand disclosed that (1) his investigation apparently consisted of only a handful of employee interviews, even though he knew no City employees (other than Ms. Gable and Mr. Dantzer) personally witnessed the sexual assault; (2) he did not attempt to obtain any security camera footage from the hotel or any other establishment around where the sexual assault occurred; and (3) the investigation's results were inconclusive, and her claims were unsubstantiated, due to a lack of eye witnesses.

32.    Mr. Helfand also explained that his investigation ultimately resulted in Mr. Dantzer being instructed not to communicate with Ms. Gable directly, other than in writing or in the

presence of other City employees. In response, Ms. Gable explicitly stated that being forced to work in the same building as her attacker appeared to be retaliation for submitting a complaint. Mr. Helfand declined to provide any other details, however, citing attorney-client privilege.

33.    As a result, Ms. Gable was forced to continue working in close vicinity to Mr. Dantzer, as if everything were "business as usual."

34.    Immediately after the City Council convened for its regular monthly meeting on the evening of February 10, however, Ms. Gable began to experience high blood pressure. As a result, she was induced into labor the next morning. Ms. Gable finally gave birth on February 12—two weeks earlier than her original due date—and thereafter began a brief maternity leave.

**D.  The City Continues to Victimize Ms. Gable in Retaliation for Reporting the Assault**

35.    In early January 2026, Ms. Gable was pre-approved to take three weeks of maternity leave, followed by three weeks of remote work. Under this earlier request, Ms. Gable would have been required to return to work at the office on March 30. But because she had since discovered that the City's investigation was "inconclusive"—and that Mr. Dantzer was permitted to continue working from their shared offices until after the May 2 election—Ms. Gable requested an extension of her remote work until after Mr. Dantzer is officially replaced as Mayor.

36.    Ms. Gable submitted this request to the Mayor Pro Tem, City Council member Jack Huitt ("Mr. Huitt"). As Mayor Pro Tem, Mr. Huitt would typically assume the Mayor's duties in his absence. Those duties typically included making managerial decisions concerning City employees, such as approving requests for leave.

37.    More importantly, Mr. Huitt was the only remaining member of management Ms. Gable could turn to after Mr. Whittaker's termination (apart from Mr. Dantzer).

38.    Ms. Gable therefore wrote to Mr. Huitt on March 17, 2026, asking to extend her remote work until after the May 2 election:

8

I am beyond thankful for City Council's decision to approve 3 weeks of maternity leave followed by 3 weeks of remote work, however, as I am wrapping up my approved time working remote, <u>I recognize my physical return as unwise considering recent events</u>.

Returning to work at City Hall puts me right back where I was before I left. While I have been advised to report to you, <u>Mayor Dantzer still has access to the building in which I will be required to work</u>. In precaution of my safety and fear for possible retaliation in response to recent events, I would have to put precautionary measures in place to protect myself.

Until he loses access, I ask to remain remote, which I understand will be after the May 2nd General Election is canvassed.

39.     The evening of March 23, Mr. Huitt finally responded and denied Ms. Gable's request. He claimed that "City Council will discuss your request to continue working from home at a special meeting scheduled for March 31st" at 6:00 p.m. (the standard time for City meetings) and instructed her to report to the office on March 30 and 31.

40.     At or around 6:00 p.m. on March 31, after a large crowd of residents and news reporters had already gathered at City Hall, Mr. Huitt suddenly announced that the meeting was cancelled. He explained there were not enough City Council members for a quorum, but he also admitted he knew of this issue at least an hour prior (and nevertheless waited until the last minute to cancel the publicly announced meeting).

41.     As a result, Ms. Gable was forced to show up again the next day and continue working from the office. Mr. Huitt also explained that Ms. Gable's request would now be taken up "at the next meeting we can schedule" <u>without providing any sort of timeline</u>. In other words, the City is now requiring Ms. Gable to work from the same building as her attacker *indefinitely*.

42.     Adding insult to injury, both Mr. Helfand and Mr. Huitt responded to Ms. Gable's multiple written appeals and requests to continue working remotely (or for the City to otherwise ensure her safety) by <u>repeatedly</u> describing her sexual assault complaint as "<u>unsubstantiated</u>."

**E.  Summary**

43.    Throughout Ms. Gable's employment with the City, Mr. Dantzer was acting (a) in the course and scope of his role as a City Council member and, later, the Mayor of the City; (b) under color of the laws and regulations of the City and the State of Texas; and/or (c) as the policymaker for the City with final authority to establish municipal policy.

44.    Furthermore, at the time of the assault on October 29, 2025, and at all times thereafter, Mr. Dantzer was acting (a) in the course and scope of his role as the City's Mayor; (b) under color of the laws and regulations of the City and the State of Texas; and/or (c) as the policymaker for the City with final authority to establish municipal policy, including without limitation because he was "the chief executive officer of the municipality." *See* Tex. Loc. Gov't Code § 22.042(a).

45.    The sexual assault on October 29, 2025, violated Ms. Gable's Fourteenth Amendment right to bodily integrity; and the harassment and retaliation that Ms. Gable experienced after submitting her complaint on November 5, 2025, violated Ms. Gable's First Amendment right to free speech.

46.    The City had a policy or custom in place that permitted Mr. Dantzer to violate Ms. Gable's right to bodily integrity as well as her right to free speech.

47.    Specifically, Mr. Dantzer and other employees under his direct control or influence permitted Mr. Dantzer to sexually harass Ms. Gable and other female City employees, including by (a) refusing to take any actions to discipline Mr. Dantzer or keep Ms. Gable safe at work; and (b) failing to conduct an adequate investigation into Ms. Gable's claims while repeatedly describing them as "unsubstantiated."

48.    Furthermore, Mr. Dantzer and other employees under his direct control or influence fostered a hostile work environment to discourage Ms. Gable and other City employees from

10

reporting workplace violations or other illegal behavior, including by (a) prohibiting Ms. Gable from disclosing the October 29 assault (or the City's inadequate investigation) to any third parties, while publicly blaming her for keeping the results confidential; and (b) retaliating against employees—such as Ms. Powell, Mr. Whittaker, and Ms. Gable—who report or assist in reporting workplace discrimination or harassment.

## V. COUNT 1—42 U.S.C. § 1983:
### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS AGAINST MR. DANTZER IN HIS INDIVIDUAL CAPACITY

49. Plaintiff incorporates the preceding paragraphs as if set forth herein.

50. At the time of Plaintiff's protected speech, she was acting as a private citizen speaking as to a matter of public concern.

51. Plaintiff's interest in her statements and formal reports of workplace violations and/or other illegal behavior outweighs any interest of the City in promoting the efficient operation and administration of government services.

52. The adverse employment action taken against Plaintiff would deter a person of ordinary firmness from continuing to engage in the protected speech.

53. Furthermore, Plaintiff's protected speech was a substantial and motivating factor in Defendants' decision to retaliate against Plaintiff, including by failing to adequately investigate her complaints and forcing her to continue working in the same vicinity as her attacker.

54. At the time of the sexual assault, Mr. Dantzer was acting (a) within the course and scope of his position as the Mayor of the City, and (b) under color of the laws and regulations of the City and the State of Texas.

55. Mr. Dantzer's actions violated Plaintiff's clearly established constitutional rights and were not objectively reasonable in light of the circumstances.

11

56.     Furthermore, Mr. Dantzer acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiff's right to free speech protected under the First Amendment, and for Plaintiff's right to bodily integrity under the Fourteenth Amendment.

57.     Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of Mr. Dantzer's illegal actions in violation of 42 U.S.C. § 1983.

### VI.  COUNT 2—42 U.S.C. § 1983: *MONELL* LIABILITY AGAINST THE CITY

58.     Plaintiff incorporates the preceding paragraphs as if set forth herein.

59.     The City's policy or custom enabled its agents and employees, including Mr. Dantzer, to act with deliberate indifference to Plaintiff's clearly established constitutional rights, including her First Amendment right to free speech and Fourteenth Amendment right to bodily integrity.

60.     Furthermore, as the Mayor, Mr. Dantzer was the City's chief executive officer and therefore exercised broad authority over its operations, including without limitation by making employment decisions, managing subordinate officers, overseeing adherence to relevant laws/ordinances, and making recommendations to the City's governing body (the City Council). In other words, Mr. Dantzer is a final policymaker for the City.

61.     Mr. Dantzer deliberately chose to follow a course of action by which he and other City employees under his direct influence or control (1) acted with deliberate indifference to Plaintiff's right to free speech and bodily integrity, including by terminating employees who were attempting to prevent any further deprivation of Plaintiff's constitutional rights; and (2) retaliated against Plaintiff for her exercise of the aforementioned constitutional rights.

62.     Furthermore, Plaintiff's protected speech was a substantial and motivating factor in Defendants' decision to retaliate against Plaintiff.

63.     Defendants acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiff's established constitutional rights, including because Defendants' actions during and following the sexual assault were not objectively reasonable in light of the circumstances.

64.     Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of the City's illegal actions and Plaintiff's constructive discharge in violation of 42 U.S.C. § 1983.

## VII.  COUNT 3—RETALIATION IN VIOLATION OF THE TEXAS WHISTLEBLOWER ACT

65.     Plaintiff incorporates the preceding paragraphs as if set forth herein.

66.     Plaintiff reported a violation of law by Mr. Dantzer, a public employee and the City's chief executive officer, to the City and other appropriate law enforcement authorities.

67.     Plaintiff's report regarding Mr. Dantzer's violation of law was made in good faith.

68.     The harassment and retaliation that Plaintiff experienced at the hands of Defendants—including by failing to adequately investigate Ms. Gabel's complaint and, thereafter, requiring her to continue working in the same vicinity as her attacker—would not have occurred when it did if Plaintiff had not reported the illegal conduct.

69.     Plaintiff timely initiated the grievance or appeal procedures as required by Texas Government Code § 554.006.

70.     Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of the City's illegal actions and Plaintiff's constructive discharge in violation of the Act.

## VIII.  COUNT 4—INFLICTION OF BODILY INJURY AGAINST MR. DANTZER

71.  Plaintiff incorporates the preceding paragraphs as if set forth herein.

72.  Mr. Dantzer made physical contact with Plaintiff's person by assaulting her on October 29, 2025.

73.  Mr. Dantzer intentionally and knowingly caused Plaintiff's bodily injury, resulting in damages to Plaintiff.

74.  Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of Mr. Dantzer's illegal actions.

## IX.  COUNT 5—ASSAULT BY OFFINSIVE PHYSICAL CONTACT AGAINST MR. DANTZER

75.  Plaintiff incorporates the preceding paragraphs as if set forth herein.

76.  Mr. Dantzer knowingly and intentionally made offensive physical contact with Plaintiff's person on October 29, 2025.

77.  Mr. Dantzer knew or reasonably should have believed that Plaintiff would regard the physical contact as offensive.

78.  Mr. Dantzer's actions caused injury, and resulting damages, to Plaintiff.

79.  Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of Mr. Dantzer's illegal actions.

## X.  COUNT 6—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST MR. DANTZER

80.  Plaintiff incorporates the preceding paragraphs as if set forth herein.

81.  In the alternative, Plaintiff brings suit against Mr. Dantzer for intentional infliction of emotional distress in Plaintiff's individual capacity.

14

82.     Mr. Dantzer's conduct on October 29, 2025, was intentional and/or reckless.

83.     Mr. Dantzer's conduct on October 29, 2025, was extreme and outrageous.

84.     Mr. Dantzer's conduct proximately caused severe emotional distress to Plaintiff, as well as resulting damages.

85.     Plaintiff's severe emotional distress cannot be remedied by any other cause of action.

86.     Plaintiff's injury resulted from Mr. Dantzer's malice, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code § 41.003(a)(2).

87.     Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of Mr. Dantzer's illegal actions.

## XI.  DAMAGES

88.     Plaintiffs incorporate the preceding paragraphs as if set forth herein.

89.     As a direct and proximate cause of Defendants' actions, Plaintiff suffered the following injuries and damages:

      a.     Actual damages;

      b.     Exemplary damages;

      c.     Lost earnings;

      d.     Loss of earning capacity;

      e.     Damage to reputation in the past and future; and

      f.     Mental anguish in the past and future.

## XII.  ATTORNEYS' FEES & COSTS

90.     Plaintiff is entitled to an award of attorneys' fees and costs, including without limitation expert fees, under 42 U.S.C. § 1988(b)-(c) and Texas Government Code § 554.003(a).

## XIII.  DEMAND FOR JURY TRIAL

91.    Plaintiff demands a trial by jury in this action.

## XIV.  CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests judgment in her favor against all Defendants, jointly and severally, as follows:

a.    Actual and/or compensatory damages;

b.    Punitive and/or exemplary damages;

c.    Pre- and post-judgment interest;

d.    Plaintiff's costs of suit and reasonable attorneys' fees; and

e.    Such additional or alternative relief as the Court deems just and proper.

Dated: April 8, 2026                          Respectfully submitted,

**PORTER HEDGES LLP**

By:   /s/ William R. Stukenberg
        William R. Stukenberg, *Attorney-in-Charge*
        Texas Bar No. 24051397
        SD Federal ID No. 613841
        Emil M. Sadykhov
        Texas Bar No. 24110316
        SD Federal ID No. 3385031
        1000 Main Street, FL 36
        Houston, TX 77002
        wstukenberg@porterhedges.com
        esadykhov@porterhedges.com
        Telephone: (713) 226-6611
        Facsimile: (713) 228-1331

**ATTORNEYS FOR PLAINTIFF
CHRISTIAN GABLE**

16