**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **CHRISTIAN GABLE,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **Case No. 4:26-cv-02780** |
| | § | |
| | § | |
| **CITY OF MAGNOLIA, TEXAS and** | § | |
| **MATTHEW "DOC" DANTZER,** | § | |
| | § | |
| | § | |
| **Defendants** | § | |

**PLAINTIFF'S AMENDED COMPLAINT**

Plaintiff Christian Gable ("Plaintiff" or "Ms. Gable") files this Amended Complaint against Defendants City of Magnolia, Texas (the "City"), and Matthew "Doc" Dantzer ("Mr. Dantzer" and, collectively with the City, "Defendants"), and respectfully shows as follows:

**I.  PARTIES**

1.      Ms. Gable is an individual resident of the State of Texas.

2.      The City is a municipal corporation organized under Texas law, and it has entered an appearance in this matter after accepting service.

3.      Mr. Dantzer is and was at all relevant times the Mayor of the City and therefore the final policymaker for the City's internal operations, including without limitation the City's personnel decisions. He is sued in his individual capacity and has entered an appearance in this matter after accepting service.

**II.  JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because Plaintiff's claims

against Defendants are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy.

5.    Venue is proper under 28 U.S.C. § 1391(b) because Defendants are located and/or reside, and a substantial part of the events and omissions giving rise to Plaintiff's claims against Defendants occurred, in Montgomery County, Texas, within the Southern District of Texas. This Court therefore has personal jurisdiction over the City, a Texas municipal corporation located within the Southern District of Texas, as well as Mr. Dantzer.

### III.  CONDITIONS PRECEDENT

6.    All conditions precedent have been performed or have occurred.

### IV.  FACTS

**A.  Ms. Gable's Employment with the City**

7.    Ms. Gable began working for the City in August 2021. At the time, she had recently lost her job due to the COVID-19 pandemic and was moving back in with her parents. Mr. Dantzer was her parents' neighbor and a family friend of approximately 10 years, and she would occasionally interact with him as a result. And, when Mr. Dantzer (who was then a City Council member) found out that Ms. Gable lost her job, he offered her a position with the City as a Floater in the Utilities Department.

8.    As a long-time neighbor and family friend, Mr. Dantzer occasionally made inappropriate sexual jokes and comments to Ms. Gable in the past. But when Ms. Gable became a City employee, Mr. Dantzer's unprofessional behavior quickly escalated.

9.    At the start of her employment, for example, Ms. Gable would often return to her family's home for lunch. But when Mr. Dantzer caught on to Ms. Gable's lunch routine, he began showing up, uninvited, and waiting in the home for her to arrive. He would then typically engage in small talk but, with each subsequent visit, increasingly corner Ms. Gable in certain parts of the

2

house as well. Eventually, this made Ms. Gable so uncomfortable that she stopped going home for lunch entirely.

10.     Not long after she was hired, Ms. Gable was promoted to the role of Permits Technician and eventually assumed the role of Planning Coordinator. In early 2023, Ms. Gable took on additional responsibilities as the Interim City Secretary after the former City Secretary resigned. By late 2023, Ms. Gable was promoted to the role of City Secretary on a full-time basis.

11.     In her role as City Secretary, Ms. Gable worked from the offices in City Hall. Ms. Gable's office was not only in the same building as Mr. Dantzer's office, but it was also accessible through a file room and adjoining hallway that led to an office neighboring Mr. Dantzer's. Thankfully for Ms. Gable, Mr. Dantzer rarely came to work at the office during the regular course of business (which presented less opportunities for harassment).

12.     When Mr. Dantzer did work from the office, however, the unprofessional jokes and sexual comments persisted. For example, Mr. Dantzer would often introduce Ms. Gable to his guests at City Hall as "the City Sexetary" or, occasionally, "my Sexetary." But because Mr. Dantzer was "the chief executive officer" of the City, *see* Tex. Loc. Gov't Code § 22.042(a), and therefore her superior, Ms. Gable felt she had no other choice but to endure Mr. Dantzer's harassment if she wanted to keep her job.

## B.  Mr. Dantzer Sexually Assaults Ms. Gable in Fort Worth

13.     From October 29 to October 31, 2025, Ms. Gable attended the Texas Municipal League's Annual Conference in Fort Worth, Texas, along with Mr. Dantzer and two other members of City management: the City Administrator, Chris Whittaker ("Mr. Whittaker"), and the Human Resources Director, Kristy Powell ("Ms. Powell").

14.     Ms. Gable was five months pregnant at the time.

15.    After dinner on the night of October 29, Mr. Dantzer offered to walk Ms. Gable back to the hotel while the others continued their night out. After checking her GPS and confirming it would only be a 12-minute walk back to the hotel, Ms. Gable reluctantly accepted. But because of her past experience with Mr. Dantzer, Ms. Gable texted her boyfriend (now fiancée) that she was about to walk back alone with Mr. Dantzer as a precaution (since her boyfriend was aware of the prior incidents with Mr. Dantzer).

16.    On the walk back, Mr. Dantzer began to make inappropriate and sexualized statements to Ms. Gable. Approximately halfway between the restaurant and the hotel, Mr. Dantzer asked Ms. Gable whether she was wearing pajama pants. Ms. Gable responded that they were not, but they appear loose because she needed them to accommodate her pregnancy. Mr. Dantzer responded: "You know what that means to me, right? They're easy to pull down." But when Ms. Gable responded that they were actually tight due to her pregnancy, he stated that they'd be easy to pull down after they "get past the bump" then repeatedly attempted to pull her pants down as they continued walking down the street.

17.    Initially, Ms. Gable yelled out. Fearful of Mr. Dantzer's position of authority over her, however, Ms. Gable quickly composed herself and attempted to play it off as a joke. But as they approached the hotel entrance, Mr. Dantzer then asked Ms. Gable whether her boyfriend "knows how to handle" her because she is "crazy." After Ms. Gable jokingly replied, "he's aware," **Mr. Dantzer suddenly—and violently—grabbed Ms. Gable's throat and pinned her against a column while saying "you need to tell him to do it like this."**

18.    Ms. Gable, now in fight-or-flight mode, yelled out and managed to push Mr. Dantzer off, after which she attempted to regain her composure and retreated to her hotel room. Mr. Dantzer sent her a text message apologizing shortly thereafter.

4

19.     Ms. Gable reported the sexual assault to Ms. Powell the next morning after it occurred, and Ms. Powell immediately notified Mr. Whittaker of the same. In response, Mr. Whittaker encouraged Ms. Powell to formally report the sexual assault in writing—and for Ms. Gable to report it to law enforcement (which she did)—and otherwise indicated his support.

20.     On November 4, Ms. Powell submitted a written report to Mr. Whittaker regarding the sexual assault, along with a request for whistleblower protection under the Texas Whistleblower Act (the "Act"). Later that day, Mr. Dantzer suddenly appeared in Ms. Gable's office, slammed his palms on her desk without exchanging so much as a greeting, and caused his entire body to hover inches from Ms. Gable's face. A few silent moments later, Mr. Dantzer stepped away then began to question Ms. Gable on whether and where she had recently purchased a home. Still fearful of her safety—but also of losing her job—Ms. Gable remained vague and responded with an approximate location. Mr. Dantzer quickly retorted by naming the exact neighborhood, <u>implying that he somehow already knew where she was moving</u>.

21.     On November 5, Ms. Gable submitted her own written complaint and request for whistleblower protection stemming from the October 29 sexual assault. Shortly thereafter, Ms. Gable was informed that the City would hire third-party investigators to conduct an investigation. The City Attorney, Leonard Schneider ("Mr. Schneider"), also called and instructed Ms. Gable to keep this matter confidential, act as if nothing happened, and continue reporting to work at City Hall until further notice.

22.     After Ms. Powell submitted her written report on November 4, several employees with a close personal and working relationship with Mr. Dantzer began to make her work environment even more hostile in apparent retaliation for reporting the sexual assault. Two different City employees then confirmed Ms. Powell's fears when they informed her that Mr.

Dantzer explicitly stated he was "going after" Ms. Powell, Ms. Gable, and Mr. Whittaker—and wanted to terminate their employment—for reporting the sexual assault. By late November 2025, Mr. Dantzer and the employees close to him made Ms. Powell's work environment so intolerable that she felt compelled to resign.

**C. The City Conducts a Sham Investigation and Fails to Protect Ms. Gable Following the Sexual Assault**

23.     In the months after Ms. Gable submitted her written complaint against Mr. Dantzer, she continued to work from the office as required. The City did not place Mr. Dantzer on administrative leave, move his (or Ms. Gable's) office to a different location, or take any other safety precautions pending the investigation results.

24.     Unsurprisingly, Ms. Gable's workdays were filled with dread and anxiety at the prospect of Mr. Dantzer appearing any minute and repeating the October 29 assault—or worse. This fear was made more acute by the fact that Mr. Dantzer's office was located in close proximity to Ms. Gable's office.

25.     In mid-January 2026, Mr. Dantzer uncharacteristically began to appear at the office every workday and remain there throughout the day. This sudden change in Mr. Dantzer's behavior obviously caused Ms. Gable further anxiety—including to the point that she began closing the door to the hallway leading to the neighboring file room and hanging a baby rattle from the doorknob (to alert her if Mr. Dantzer attempted to enter her office from there).

26.     At this point, Ms. Gable had begun losing sleep and was becoming crippled with anxiety due to her attacker's continued presence at her workplace.

27.     Furthermore, Mr. Whittaker essentially acted as Ms. Gable's intermediary with Mr. Dantzer for City business during this period. On January 28, however, the City suddenly

terminated Mr. Whittaker's employment, thereby removing yet another barrier between Ms. Gable and her attacker.

28.   Unbeknownst to Ms. Gable, at that point the City had already concluded its investigation into the sexual assault *weeks ago*—which, coincidentally, was around the time Mr. Dantzer began regularly appearing at the office—and yet allowed her to continue working in close proximity to her attacker, day after day, while at this point *eight months pregnant*.

29.   Specifically, the City Attorney, Leonard Schneider ("Mr. Schneider"), called Ms. Gable few hours before close-of-business on January 28, 2026, and finally informed her—for the first time—that the investigation into her complaint had concluded. Shockingly, he also informed Ms. Gable that the City formally closed the investigation *over two weeks* earlier on the evening of January 13, immediately after that evening's City Council meeting.

30.   On January 29, Mr. Schneider assured Ms. Gable that she would be provided with a copy of the investigation report. She was then invited to a virtual meeting with the lead third-party investigator hired to investigate the sexual assault: Bill Helfand ("Mr. Helfand") of the law firm Lewis Brisbois Bisgaard & Smith LLP.

31.   At the January 29 virtual meeting, Mr. Helfand disclosed that (1) his investigation apparently consisted of only a handful of employee interviews, even though he knew no City employees (other than Ms. Gable and Mr. Dantzer) personally witnessed the sexual assault; (2) he did not attempt to obtain any security camera footage from the hotel or any other establishment around where the sexual assault occurred; and (3) the investigation's results were inconclusive, and her claims were unsubstantiated, due to a lack of eye witnesses.

32.   Specifically, when Ms. Gable asked at the meeting whether the investigation checked security footage from the area, Mr. Helfand responded that "we [were] making an

7

investigation in Houston" and "we don't go to Fort Worth, for example, and go to the location you described and look around to see if there is camera footage"—even after Ms. Gable provided the exact location where the assault occurred. Additionally, Mr. Helfand claimed that Ms. Gable "acknowledged that there weren't any eye witnesses" and seemingly attempted to blame her for the investigation's "inconclusive" results. Ms. Gable's written complaint to the City, however, clearly stated "[the assault in front of the Omni Hotel] was in plain sight to anybody who was inside the hotel's Starbucks, across the hotel at the convention center, driving or parked along the road, and anybody inside the valet area would likely see him with his arm reached toward the pillar pinning me." *See* Exhibit 1, Christian Gable Formal Complaint (dated Nov. 5, 2025) at 2.

33.    Mr. Helfand also explained that his investigation ultimately resulted in Mr. Dantzer being instructed not to communicate with Ms. Gable directly, other than in writing or in the presence of other City employees. In response, <u>Ms. Gable explicitly stated that being forced to work in the same building as her attacker appeared to be retaliation for submitting a complaint</u>. Mr. Helfand declined to provide any other details, however, citing attorney-client privilege.

34.    As a result, Ms. Gable was forced to continue working in close vicinity to Mr. Dantzer—her attacker—as if nothing had happened.

35.    Furthermore, it was later revealed that Mr. Helfand and his team apparently investigated Ms. Powell's professional conduct more diligently than—and possibly instead of—the October 29 assault, even though Ms. Powell's conduct was never the subject of Ms. Gable's and Ms. Powell's formal complaints. Upon information and belief, Mr. Dantzer improperly influenced and/or directed the focus of the City's investigation away from his own actions and to pretextually investigate (and eventually terminate) Ms. Powell instead.

8

36.     Immediately after the City Council convened for its regular monthly meeting on the evening of February 10, Ms. Gable began to experience high blood pressure. As a result, she was induced into labor the next morning. Ms. Gable finally gave birth on February 12—two weeks earlier than her original due date—and thereafter began a brief maternity leave.

**D. The City Continues to Victimize Ms. Gable in Retaliation for Reporting the Assault While Protecting Mr. Dantzer**

37.     In early January 2026, Ms. Gable was pre-approved to take three weeks of maternity leave, followed by three weeks of remote work. Under this earlier request, Ms. Gable would have been required to return to work at the office on March 30. But because she had since discovered that the City's investigation was "inconclusive"—and that Mr. Dantzer was permitted to continue working from their shared offices until after the May 2 election—Ms. Gable requested an extension of her remote work until after Mr. Dantzer is officially replaced as Mayor.

38.     Ms. Gable submitted this request to the Mayor Pro Tem, City Council member Jack Huitt ("Mr. Huitt"). As Mayor Pro Tem, Mr. Huitt would typically assume the Mayor's duties in his absence. Those duties typically included making managerial decisions concerning City employees, such as approving requests for leave.

39.     More importantly, Mr. Huitt was the only remaining member of management Ms. Gable could turn to after Mr. Whittaker's termination (apart from Mr. Dantzer).

40.     Ms. Gable therefore wrote to Mr. Huitt on March 17, 2026, asking to extend her remote work until after the May 2 election:

> I am beyond thankful for City Council's decision to approve 3 weeks of maternity leave followed by 3 weeks of remote work, however, as I am wrapping up my approved time working remote, <u>I recognize my physical return as unwise considering recent events</u>.
>
> Returning to work at City Hall puts me right back where I was before I left. While I have been advised to report to you, <u>Mayor Dantzer still has access to the building in which I will be required to work</u>. In precaution of my safety and fear for possible

> retaliation in response to recent events, I would have to put precautionary measures in place to protect myself.
>
> Until he loses access, I ask to remain remote, which I understand will be after the May 2nd General Election is canvassed.

41.     The evening of March 23, Mr. Huitt finally responded and denied Ms. Gable's request. He claimed that "City Council will discuss your request to continue working from home at a special meeting scheduled for March 31st" at 6:00 p.m. (the standard time for City meetings) and instructed her to report to the office on March 30 and 31.

42.     At or around 6:00 p.m. on March 31, after a large crowd of residents and news reporters had already gathered at City Hall, Mr. Huitt suddenly announced that the meeting was cancelled. He explained there were not enough City Council members for a quorum, but he also admitted he knew of this issue at least an hour prior (and nevertheless waited until the last minute to cancel the publicly announced meeting).

43.     As a result, Ms. Gable was forced to show up again the next day and continue working from the office. Mr. Huitt also explained that Ms. Gable's request would now be taken up "at the next meeting we can schedule" without providing any sort of timeline. In other words, the City was requiring Ms. Gable to work from the same building as her attacker *indefinitely*.

44.     Adding insult to injury, both Mr. Helfand and Mr. Huitt responded to Ms. Gable's multiple written appeals and requests to continue working remotely (or for the City to otherwise ensure her safety) by repeatedly describing her sexual assault complaint as "unsubstantiated."

45.     For example, Mr. Huitt wrote to Ms. Gable on April 1, 2026, instructing her to continue working from City Hall while simultaneously disclaiming any authority "to change the terms or conditions of [her] employment with the City." He then denied Ms. Gable's request to receive a copy of the investigation report, stating: "you know the outcome of the investigation. You met by videoconference with the lawyers who conducted the investigation and who wrote the

report. They specifically told you that there is no evidence from any of the witnesses you identified or any tangible thing that substantiates your allegations, all of which the mayor has flatly denied. Even if the City has authority to take corrective action against an elected official – a legal question on which I am not qualified to offer an opinion – there is no basis for the city to take corrective action against anyone based on an unsubstantiated claim." *See* Exhibit 2, April 1, 2026 J. Huitt Email at 1-2.

46.     Meanwhile, the City used the sham investigation as both sword and shield: citing the investigation to force Ms. Gable to work in the vicinity of her attacker and assuage an angry public at a March 10, 2026 City Council meeting that the City sufficiently investigated the October 29 assault. Specifically, Mr. Schneider told the citizens gathered at the March 10 City Council meeting: "We hired an outside investigator so there would be no type of allegations that somebody shows favoritism. That investigation interviewed six people. It was inconclusive. I'm sorry. We don't have the authority to go to Fort Worth to get tapes." *See* Exhibit 3, Transcript from Portion of March 10, 2026 Magnolia City Council Meeting at 6:14-21.

47.     Mr. Schneider also claimed that there was nothing the City could do to discipline or remove Mr. Dantzer due to the investigation's results. Specifically, he told the citizens gather at the March 10 City Council meeting: "If we were a private corporation, there may have been a suspension. But we're a city. And local government code [sic] we can't remove an elected official for this type of complaint. It has to be a crime of moral turpitude, a conviction, not an allegation, not a rumor, not a incomplete investigation." *See* Exhibit 3 at 10:20-11:1.

48.     Eventually, however, Mr. Schneider was forced to admit at the March 10 City Council meeting that the supposedly "third-party" investigation was conducted to protect the City rather than its employees—including, importantly, Ms. Gable.

11

49.     Thereafter, the City posted an official agenda for a Special City Council meeting set to take place on April 20. The original agenda included the following item: "Consideration and possible action on Resolution No. R-2026-009 to censure the Mayor." Immediately before the regular City Council meeting on April 14, however, Mr. Schneider inquired with Ms. Gable about amending and reposting the April 20 Special Council Meeting agenda. And, after the April 14 regular meeting, Mr. Huitt instructed Ms. Gable to remove the censure item and repost the agenda. Ms. Gable did as instructed that same evening, and Mr. Dantzer was never censured.

50.     Making matters worse, the timing does not appear to be coincidental. On or around the morning of April 14, 2026, Mr. Dantzer was arrested and charged by the Tarrant County District Attorney's office with (1) felony assault of a pregnant person, and (2) misdemeanor official oppression. Unlike the City's "third-party" investigators, the Texas Rangers had successfully obtained video evidence of the October 29 assault.

### E.  The City Retaliates Again by Improperly Deducting Ms. Gable's Pay

51.     Mr. Dantzer posted bond and was set free shortly after his arrest. The City, however, refused to prohibit Mr. Dantzer from accessing City Hall. In other words, Ms. Gable continued to be in danger of further assault.

52.     Ms. Gable therefore continued to work from home—just as she had done, without issue, during the three weeks following her maternity leave—out of fear for her safety and she notified the City of the same. After demanding that Ms. Gable nevertheless return to work in-person at City Hall, however, the City eventually suspended Ms. Gable's remote access to the City's computer systems. *See* Exhibit 4, April 17, 2026 J. Huitt Email at 1.

53.     The City also deducted around 80 hours of Ms. Gable's accrued balance of Paid Time Off ("PTO") for the days she worked from home and/or her computer access was suspended, effectively placing her on unpaid leave. *See* Exhibit 5, April 21, 2026 M. Nunes Email at 1.

12

54. Upon information and belief, Mr. Huitt was directly or indirectly involved in the decision to deduct Ms. Gable's PTO, and the deduction was made in retaliation for Ms. Gable's original complaint regarding Mr. Dantzer and/or for continuing to voice concerns regarding her unsafe work conditions.

55. Furthermore, Ms. Gable's PTO was deducted seemingly without City Council's approval or authorization—despite Mr. Huitt's claim that he does not "have authority to change the terms or conditions of [Ms. Gable's] employment with the City" and that "[o]nly City Council may do so." *See* Exhibit 2 at 1.

56. In other words, Mr. Huitt's claim that he did not have authority to permit Ms. Gable from working from home was merely pretext for continued retaliation, both in the form of requiring Ms. Gable to work in close vicinity to her attacker and then deducting Ms. Gable's PTO.

57. And, despite the fact that Mr. Dantzer had been arrested and charged in connection with the October 29 assault, Mr. Huitt continued to downplay Ms. Gable's fear of continued harassment and/or assault by Mr. Dantzer following his release on bond. For example, Mr. Huitt described Ms. Gable's repeated requests for protection from the now-released Mr. Dantzer as "hypothetical concerns"—including because Ms. Gable had not been assaulted again. *See* Exhibit 6, April 21, 2026 J. Huitt Email at 1; Exhibit 7, April 16, 2026 J. Huitt Email at 1 ("Since [the formal complaint], you have suggested the *potential* for a problem as a reason not to come to work, but you have not reported any actual problem at all.").

**F. Summary**

58. Throughout Ms. Gable's employment with the City, Mr. Dantzer was acting (a) in the course and scope of his role as a City Council member and, later, the Mayor of the City; (b) under color of the laws and regulations of the City and the State of Texas; and/or (c) as the policymaker for the City with final authority to establish municipal policy.

59. Furthermore, at the time of the assault on October 29, 2025, and at all times thereafter, Mr. Dantzer was acting (a) in the course and scope of his role as the City's Mayor; (b) under color of the laws and regulations of the City and the State of Texas; and/or (c) as the policymaker for the City with final authority to establish municipal policy, including without limitation because he was "the chief executive officer of the municipality." *See* Tex. Loc. Gov't Code § 22.042(a).

60. The sexual assault on October 29, 2025, violated Ms. Gable's Fourteenth Amendment right to bodily integrity and equal protection; and the harassment and retaliation that Ms. Gable experienced after submitting her complaint on November 5, 2025, violated Ms. Gable's First Amendment right to free speech, as well as her Fourteenth Amendment right to equal protection.

61. The City had a policy or custom in place that permitted Mr. Dantzer to violate Ms. Gable's right to equal protection, bodily integrity, and free speech.

62. Specifically, Mr. Dantzer and other employees under his direct control or influence permitted and/or enabled Mr. Dantzer to sexually harass and retaliate against Ms. Gable and other female City employees, including by (a) refusing to take any actions to discipline Mr. Dantzer or keep Ms. Gable safe at work; (b) failing to conduct an adequate investigation into Ms. Gable's claims while repeatedly minimizing her continuing concerns related to the same; (c) requiring Ms. Gable to work in the same vicinity as her attacker despite repeatedly voicing her concerns; (d) deducting Ms. Gable's accrued PTO in retaliation for voicing her concerns; and (e) protecting Mr. Dantzer from any repercussions or public scrutiny as a result of the October 29 assault, including without limitation by removing the censure item from the April 20 Special Council Meeting agenda.

14

63. Furthermore, Mr. Dantzer and other employees under his direct control or influence fostered a hostile work environment to discourage Ms. Gable and other City employees from reporting workplace violations or other illegal behavior, including by (a) prohibiting Ms. Gable from disclosing the October 29 assault (or the City's sham investigation) to any third parties, while publicly blaming Ms. Gable for the results confidential; (b) continuing to protect Mr. Dantzer from any repercussions or public scrutiny as a result of the October 29 assault; and (c) retaliating against employees—such as Ms. Powell, Mr. Whittaker, and Ms. Gable—who report or assist in reporting workplace discrimination or harassment, including without limitation by deducting accrued PTO (or other compensation) in retaliation for voicing concerns.

## V.   COUNT 1—42 U.S.C. § 1983:
### FIRST AMENDMENT RETALIATION AGAINST MR. DANTZER IN HIS INDIVIDUAL CAPACITY

64. Plaintiff incorporates the preceding paragraphs as if set forth herein.

65. At the time of Plaintiff's protected speech, she was acting as a private citizen speaking as to a matter of public concern.

66. Plaintiff's interest in her statements and formal reports of workplace violations and/or other illegal behavior outweighs any interest of the City in promoting the efficient operation and administration of government services.

67. The adverse employment action taken against Plaintiff would deter a person of ordinary firmness from continuing to engage in the protected speech.

68. Furthermore, Plaintiff's protected speech was a substantial and motivating factor in Defendants' decision to retaliate against Plaintiff, including by failing to adequately investigate her complaints, forcing her to continue working in the same vicinity as her attacker, and improperly deducting her pay.

69.     At the time of the sexual assault, Mr. Dantzer was acting (a) within the course and scope of his position as the Mayor of the City, and (b) under color of the laws and regulations of the City and the State of Texas.

70.     Mr. Dantzer's actions violated Plaintiff's clearly established constitutional rights and were not objectively reasonable in light of the circumstances.

71.     Furthermore, Mr. Dantzer acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiff's right to free speech protected under the First Amendment.

72.     Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of Mr. Dantzer's illegal actions in violation of 42 U.S.C. § 1983.

## VI.  COUNT 2—42 U.S.C. § 1983:
### VIOLATION OF FOURTEENTH AMENDMENT EQUAL PROTECTION AGAINST MR. DANTZER IN HIS INDIVIDUAL CAPACITY

73.     Plaintiff incorporates the preceding paragraphs as if set forth herein.

74.     The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from subjecting individuals to discrimination on the basis of sex.

75.     At all relevant times, Mr. Dantzer acted under color of state law, including by using his official authority, position, and influence as Mayor to direct, cause, or ratify adverse actions affecting Plaintiff's employment and/or working conditions, including harassment, reprimands, deductions from pay, and other forms of retaliation.

76.     Mr. Dantzer intentionally discriminated against and harassed Plaintiff because of her sex (female), including by sexually assaulting Plaintiff on October 29, speaking to Plaintiff using inappropriate and sexually-charged language (including calling Plaintiff inappropriate and sexually-charged nicknames), and exhibiting favoritism towards male employees while exhibiting

16

discriminatory animus towards female employees, resulting in adverse treatment (including financial loss), harassment, reprimands, and other forms of retaliation.

77.    Mr. Dantzer personally participated in, directed, set in motion, and/or ratified the discriminatory treatment by spreading rumors about or endorsing distrust of Plaintiff, improperly influencing the City's investigation into the October 29 assault, and influencing or causing the adverse treatment (including financial loss), harassment, reprimands, and other forms of retaliation.

78.    Defendants' decision to directly and indirectly harass, reprimand, and/or retaliate against Plaintiff violated Plaintiff's clearly established constitutional rights and was not objectively reasonable in light of the circumstances.

79.    Furthermore, Mr. Dantzer acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiff's right to equal protection protected under the Fourteenth Amendment, and with the intent to benefit male employees and/or burden Plaintiff as a result of her sex (female).

80.    Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of Mr. Dantzer's illegal actions in violation of 42 U.S.C. § 1983.

### VII.  COUNT 3—42 U.S.C. § 1983: VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS AGAINST MR. DANTZER IN HIS INDIVIDUAL CAPACITY

81.    Plaintiff incorporates the preceding paragraphs as if set forth herein.

82.    The Due Process Clause of the Fourteenth Amendment secures Plaintiff's right to be free of state-occasioned damage to her bodily integrity.

17

83. Mr. Dantzer subjected Plaintiff to and caused Plaintiff to be subjected to violations of her Fourteenth Amendment right to bodily integrity that was so egregious and/or outrageous that it may fairly be said to shock the contemporary conscience.

84. Mr. Dantzer's actions violated Plaintiff's clearly established constitutional rights, were not objectively reasonable in light of the circumstances, and were done without any reasonable justification in the service of a legitimate governmental objective.

85. At the time of the sexual assault, Mr. Dantzer was acting (a) within the course and scope of his position as the Mayor of the City, and/or (b) under color of the laws and regulations of the City and the State of Texas.

86. Furthermore, Mr. Dantzer acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiff's right to bodily integrity under the Fourteenth Amendment.

87. Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of Mr. Dantzer's illegal actions in violation of 42 U.S.C. § 1983.

### VIII.  COUNT 4—42 U.S.C. § 1983: *MONELL* LIABILITY AGAINST THE CITY

88. Plaintiff incorporates the preceding paragraphs as if set forth herein.

89. The City's policy or custom enabled its agents and employees, including Mr. Dantzer, to act with deliberate indifference to Plaintiff's clearly established constitutional rights, including her First Amendment right to free speech and Fourteenth Amendment rights to equal protection and due process (including the right to bodily integrity).

90. As the former Mayor, Mr. Dantzer was the City's chief executive officer and therefore exercised broad authority over its operations, including without limitation by making, assisting in making, and/or influencing employment decisions; managing subordinate officers and

employees; overseeing adherence to relevant laws/ordinances; making recommendations to the City's governing body (the City Council) regarding all of the foregoing; and generally influencing workplace conditions and culture and the City's operations. In other words, Mr. Dantzer was a final policymaker for the City in terms of the foregoing policies, customs, or practices—including the concerted harassment and retaliation campaign as well as discriminatory animus directed at Ms. Gable and other female employees. Additionally, and/or pleading in the alternative, the City, through the City Council, City Attorney, and other leaders, ratified the unconstitutional conduct by approving, endorsing, and/or failing to remedy it (including by failing to remove, censure, or otherwise discipline Mr. Dantzer) after notice.

91.     Mr. Dantzer deliberately chose to follow a course of action by which he and other City employees under his direct influence or control (a) acted with deliberate indifference to Plaintiff's right to free speech, equal protection, and due process/bodily integrity, including by terminating employees who were attempting to prevent any further deprivation of Plaintiff's constitutional rights; and (b) retaliated against Plaintiff for her exercise of the aforementioned constitutional rights.

92.     Furthermore, Plaintiff's protected speech was a substantial and motivating factor in Defendants' decision to retaliate against Plaintiff, and a custom of deliberate indifference existed as to Mr. Dantzer and his sexual predatory conduct towards women. Despite formal complaints and purportedly impartial investigatory efforts by the City, Mr. Dantzer was allowed to sexually harass and assault Plaintiff and other women while operating as the chief executive officer of the City.

93.     Moreover, the City's policies and procedures regarding investigation of legitimate complaints against employees and/or elected officials and action based upon information discovery

as a result of said complaints and/or investigations were constitutionally inadequate, non-existent, or intentionally constructed so as to ratify, condone, and/or enable Mr. Dantzer's assault of Plaintiff and other illegal behavior. This policy of deliberate indifference and inaction coupled with inadequate training and/or supervision resulted in the violation of Plaintiff's constitutional rights and caused serious injury and harm. To the extent any policies precluding Mr. Dantzer's illegal conduct existed at all, Defendants did not adequately train, supervise, and/or enforce said policies.

94. Defendants acted with the intent to benefit male employees and/or burden Plaintiff as a result of her sex (female) as well as willfully, deliberately, maliciously, or with reckless disregard for Plaintiff's established constitutional rights, including because Defendants' actions during and following the sexual assault were not objectively reasonable in light of the circumstances.

95. These actions, conduct, and/or deficiencies set out above, individually and/or collectively, were a proximate cause of the violations against Plaintiff and thereby caused damages and harm to Plaintiff.

96. Plaintiff is therefore entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of the City's illegal actions and Plaintiff's constructive discharge in violation of 42 U.S.C. § 1983.

## IX.  COUNT 5—RETALIATION IN VIOLATION OF THE TEXAS WHISTLEBLOWER ACT

97. Plaintiff incorporates the preceding paragraphs as if set forth herein.

98. Plaintiff reported a violation of law by Mr. Dantzer, a public employee and the City's chief executive officer, to the City and other appropriate law enforcement authorities.

99. Plaintiff's report regarding Mr. Dantzer's violation of law was made in good faith.

100. The harassment and retaliation that Plaintiff experienced at the hands of Defendants—including by failing to adequately investigate Ms. Gabel's complaint and, thereafter, requiring her to continue working in the same vicinity as her attacker—would not have occurred when it did if Plaintiff had not reported the illegal conduct.

101. Plaintiff timely initiated the grievance or appeal procedures as required by Texas Government Code § 554.006.

102. Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of the City's illegal actions and Plaintiff's constructive discharge in violation of the Act.

## X. COUNT 6—INFLICTION OF BODILY INJURY AGAINST MR. DANTZER

103. Plaintiff incorporates the preceding paragraphs as if set forth herein.

104. Mr. Dantzer made physical contact with Plaintiff's person by assaulting her on October 29, 2025.

105. Mr. Dantzer intentionally and knowingly caused Plaintiff's bodily injury, resulting in damages to Plaintiff.

106. Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of Mr. Dantzer's illegal actions.

## XI. COUNT 7—ASSAULT BY OFFINSIVE PHYSICAL CONTACT AGAINST MR. DANTZER

107. Plaintiff incorporates the preceding paragraphs as if set forth herein.

108. Mr. Dantzer knowingly and intentionally made offensive physical contact with Plaintiff's person on October 29, 2025.

109.    Mr. Dantzer knew or reasonably should have believed that Plaintiff would regard the physical contact as offensive.

110.    Mr. Dantzer's actions caused injury, and resulting damages, to Plaintiff.

111.    Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of Mr. Dantzer's illegal actions.

## XII.  COUNT 8—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST MR. DANTZER

112.    Plaintiff incorporates the preceding paragraphs as if set forth herein.

113.    In the alternative, Plaintiff brings suit against Mr. Dantzer for intentional infliction of emotional distress in Plaintiff's individual capacity.

114.    Mr. Dantzer's conduct on October 29, 2025, was intentional and/or reckless.

115.    Mr. Dantzer's conduct on October 29, 2025, was extreme and outrageous.

116.    Mr. Dantzer's conduct proximately caused severe emotional distress to Plaintiff, as well as resulting damages.

117.    Plaintiff's severe emotional distress cannot be remedied by any other cause of action.

118.    Plaintiff's injury resulted from Mr. Dantzer's malice, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code § 41.003(a)(2).

119.    Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of Mr. Dantzer's illegal actions.

22

### XIII.  COUNT 9— FAILURE TO PAY OVERTIME WAGES UNDER THE FLSA AGAINST THE CITY

**A.  FLSA Coverage**

120.    Plaintiff incorporates the preceding paragraphs as if set forth herein.

121.    At all relevant times, the City was a covered employer under the Fair Labor Standards Act ("FLSA"). *See* 29 U.S.C. § 203(s)(1)(C).

122.    Plaintiff was an employee of the City pursuant to the FLSA. *See* 29 U.S.C. § 203(e).

**B.  Facts Relevant to Overtime Claim**

123.    Plaintiff incorporates the preceding paragraphs as if set forth herein.

124.    At all relevant times, Plaintiff regularly worked in excess of forty hours per seven-day workweek as an employee of the City, and the City knew or should have known that Plaintiff worked in excess of forty hours per workweek.

125.    The City agreed to pay Plaintiff a set salary of approximately $1,429.14 per week, which served as compensation for all hours worked each workweek, including those over forty in individual workweeks.

126.    The City classified Plaintiff as exempt from overtime. As a purportedly exempt employee, the City did not pay Plaintiff an overtime premiums of one-and-a-half times her regular rate of pay for hours worked over forty in individual workweeks, despite Plaintiff regularly working over forty hours per workweek, and the City did not maintain accurate time and pay records for Plaintiff as required by 29 U.S.C. § 211(c) and 29 C.F.R. Part 516.

127.    The City unlawfully deducted approximately 80 hours of Plaintiff's accrued PTO for the days she worked from home and/or her computer access was suspended.

128.    The deduction described above was made for reasons incompatible with the FLSA's salary-basis requirements and were not for full-day absences or other deductions permissible under the FLSA's regulations.

129.    The deduction was not isolated or inadvertent but reflected the City's policy or practice of making deductions from pay otherwise designated as salary.

130.    By making such deductions from Plaintiff's salary, the City failed to pay Plaintiff on a true salary basis within the meaning of the FLSA, thereby defeating any claimed exemption and rendering Plaintiff non-exempt and entitled to overtime pay for hours worked over forty in a workweek.

131.    The City did not pay Plaintiff overtime compensation at one and one-half times Plaintiff's regular rate for all hours worked over forty in each workweek.

132.    As a result, Plaintiff's regular rate for purposes of overtime likely varies from workweek to workweek, is currently not known or capable of accurate determination, and will be determined more precisely in discovery.

133.    The City's failure to pay overtime was willful because the City knew or showed reckless disregard for whether its conduct violated the FLSA, including by classifying Plaintiff as exempt while making deductions inconsistent with a salary basis and by failing to pay overtime despite Plaintiff's regular overtime hours.

134.    As a result of the City's unlawful acts, Plaintiff has suffered damages including unpaid overtime wages, liquidated damages, and other losses for which the City is liable under the FLSA.

## C.  Overtime Claim Under the FLSA

135.    Plaintiff incorporates the preceding paragraphs as if set forth herein.

136.   Plaintiff was a covered, non-exempt employee under the FLSA because the City's deductions from Plaintiff's purported salary defeated the salary-basis requirement for any claimed exemption, and/or because Plaintiff was misclassified as exempt from the FLSA's overtime requirements.

137.   The City suffered or permitted Plaintiff to work more than forty hours in workweeks during the relevant period but failed to pay Plaintiff overtime compensation at a rate not less than one and one-half times the regular rate for all hours worked over forty, in violation of 29 U.S.C. § 207.

138.   The City's violations of the FLSA were willful within the meaning of 29 U.S.C. § 255(a).

139.   As a direct and proximate result of the City's unlawful conduct, Plaintiff is entitled to recover unpaid overtime wages, an additional and equal amount as liquidated damages, attorneys' fees and costs, and prejudgment interest where available pursuant to 29 U.S.C. § 216(b).

### XIV.  COUNT 10—QUANTUM MERUIT/UNJUST ENRICHMENT AGAINST THE CITY

140.   Plaintiff incorporates the preceding paragraphs as if set forth herein.

141.   Plaintiff provided the City with services during the course of her employment.

142.   Plaintiff provided the services for the City's benefit, and the City accepted Plaintiff's services.

143.   The City knew or should have known that Plaintiff expected compensation when the City accepted her services. Specifically, the City improperly deducted 80 hours of PTO from Plaintiff's pay for the period ending May 2, 2026, even though Plaintiff adequately performed and/or was capable of performing all of her duties and required work for the City during that time.

144.   Because Plaintiff expected compensation, the City's acceptance of the services without payment resulted in damages that Plaintiff is entitled to seek, in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest.

## XV.   DAMAGES

145.   Plaintiffs incorporate the preceding paragraphs as if set forth herein.

146.   As a direct and proximate cause of Defendants' actions, Plaintiff suffered the following injuries and damages:

      a.   Actual damages;

      b.   Exemplary damages;

      c.   Lost earnings;

      d.   Loss of earning capacity;

      e.   Damage to reputation in the past and future; and

      f.   Mental anguish in the past and future.

## XVI.   ATTORNEYS' FEES & COSTS

147.   Plaintiff is entitled to an award of attorneys' fees and costs, including without limitation expert fees, under 42 U.S.C. § 1988(b)-(c), Texas Government Code § 554.003(a), Texas Civil Practice & Remedies Code § 38.001(1)-(3), and 29 U.S.C. § 216(b).

## XVII.   DEMAND FOR JURY TRIAL

148.   Plaintiff demands a trial by jury in this action.

## XVIII.   CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests judgment in her favor against all Defendants, jointly and severally, as follows:

      a.   Actual and/or compensatory damages;

      b.   Punitive and/or exemplary damages;

    c.      Pre- and post-judgment interest;

    d.      Plaintiff's costs of suit and reasonable attorneys' fees; and

    e.      Such additional or alternative relief as the Court deems just and proper.

Dated: July 6, 2026            Respectfully submitted,

                    **PORTER HEDGES LLP**

                    By:  */s/ William R. Stukenberg*
                        William R. Stukenberg, *Attorney-in-Charge*
                        Texas Bar No. 24051397
                        SD Federal ID No. 613841
                        Emil M. Sadykhov
                        Texas Bar No. 24110316
                        SD Federal ID No. 3385031
                        1000 Main Street, FL 36
                        Houston, TX 77002
                        wstukenberg@porterhedges.com
                        esadykhov@porterhedges.com
                        Telephone: (713) 226-6611
                        Facsimile: (713) 228-1331

                    **ATTORNEYS FOR PLAINTIFF**
                    **CHRISTIAN GABLE**

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

                    /s/ *Emil M. Sadykhov*
                    Emil M. Sadykhov